UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROMANO BERNARDI,

                              Plaintiff,

        -v-                                              No. 19-CV-11867 (KMK)

NEW YORK STATE DEPARTMENT OF                            OPINION & ORDER
CORRECTIONS AND COMMUNITY
SUPERVISION, *et al.*,

                              Defendants.

Appearances:

Mitchell Ian Weingarden, Esq.
Law Offices of Mitchell I. Weingarden, PLLC
White Plains, NY
*Counsel for Plaintiff*

Bruce J. Turkle, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Romano Bernardi ("Plaintiff") brings this Action, pursuant to Title VII, 42 U.S.C.

§ 2000e, *et seq.*, New York law, and 42 U.S.C. § 1983, against the New York State Department

of Corrections and Community Supervision ("DOCCS") and Daniel Rushia ("Rushia"; together,

"Defendants"), alleging that Defendants discriminated against Plaintiff in the context of his

employment based on his national origin, and retaliated against Plaintiff after he complained of

this allegedly discriminatory treatment.  (*See* Am. Compl. ("AC") (Dkt. No. 19).)  Before the

Court is Defendants' Motion To Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1)

and 12(b)(6) (the "Motion"). (Not. of Mot. (Dkt. No. 26).) For the reasons that follow, the Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are taken from Plaintiff's Amended Complaint and attached exhibits. They are assumed true for purposes of adjudicating the instant Motion.

Beginning in October 2002, Plaintiff was employed by DOCCS as an electrician working at the Bedford Hills Correctional Facility ("BHCF"). (AC ¶ 18.) Plaintiff, an Italian immigrant with a pronounced accent, (*id.* ¶ 4), confronted discrimination and abusive behavior and language throughout his employment, (*id.* ¶ 19). This included "co-workers telling [P]laintiff to 'go back to his own country,' many references to [P]laintiff's immigrant status, claims that his 'guinea food stinks', use of this and other Italian slurs, and many similar comments." (*Id.* ¶ 20 (brackets omitted).) Rushia, Plaintiff's supervisor, (*id.* ¶ 12), was among the DOCCS employees who made these statements, (*id.* ¶ 21). In addition, Plaintiff "observed that [DOCCS] [a]dministration favored non-immigrant employees[] over immigrants such as Plaintiff[] regarding the allocation, distribution[,] and payment of overtime." (*Id.* ¶ 25; *see also id.* ¶ 45 (same).) The preference given to non-immigrants benefited Rushia, who is a non-immigrant. (*Id.* ¶ 27.) Plaintiff "was very vocal and challenged the [DOCCS] administration for failing to fairly distribute overtime to him and other immigrant workers." (*Id.* ¶ 24.)

On February 28, 2014, Plaintiff filed a complaint (the "2014 Complaint") with the New York State Division of Human Rights ("NYSDHR"). (*Id.* ¶ 39.) The 2014 Complaint, among other things, charged that DOCCS discriminated when assigning overtime, favoring American

over foreign-born employees. (*Id.*; *see also id.* Ex. D ("2014 Complaint") 22 (Dkt. No. 19-1).)[1] Its primary claim was that Plaintiff had been wrongfully suspended for allegedly assaulting another employee, an incident that never occurred. (2014 Complaint 22.) The 2014 Complaint claimed that this discipline was consistent with the pattern of receiving frequent Notices of Discipline ("NODs") for behavior that other employees engaged in routinely without discipline. (*Id.*) It claimed that this discipline was the result of discrimination based on national origin and retaliation for Plaintiff's complaints about the same. (*Id.*) On April 7, 2014, DOCCS allowed Plaintiff to return to work and dropped all disciplinary charges. (*Id.* at 29.) In a filing dated May 16, 2014, Plaintiff continued to seek $10,000 in lost wages for the period during which he was improperly suspended. (*Id.* at 30.) In February 2015, Plaintiff and DOCCS settled the 2014 Complaint, with Plaintiff receiving $10,000 and DOCCS agreeing "to adhere to the Human Rights Law." (AC Ex. E ("Settlement") 43 (Dkt. No. 19-1).)

After returning to work, Plaintiff suffered a serious injury. (AC ¶ 44.) Plaintiff received Workers' Compensation benefits and missed work for much of 2016. (*Id.*) Upon returning to work in early 2017, Plaintiff observed that DOCCS continued to discriminate against foreign-born employees, including assigning them less overtime. (*Id.* ¶ 45.) Plaintiff complained about this to DOCCS administration. (*Id.* ¶ 46.) DOCCS did not properly investigate Plaintiff's complaints. (*Id.* ¶ 47.) Instead, Plaintiff claims that DOCCS continued discriminating, and later retaliated against him. (*Id.* ¶ 48–49.) On April 12, 2018, Rushia and another employee falsely accused Plaintiff of threatening and harassing them. (*Id.* ¶¶ 29–30, 32.) As a result, Plaintiff was served with a NOD on April 13, 2018 (the "April 2018 NOD"). (*Id.* ¶ 31.) In addition,

---

[1] Due to inconsistent native page numbers, the Court refers to the ECF-generated number in the upper right-hand corner when referring to exhibits appended to the Amended Complaint.

Rushia and the other employee filed criminal complaints charging harassment. (*Id*.) Plaintiff

hired counsel to contest the NOD. (*Id*. ¶ 35.) On May 8, 2018, Plaintiff's counsel submitted a

grievance (the "Grievance") to the Disciplinary Panel Administration ("DPA") of the New York

State Governor's Office of Employee Relations based upon the April 2018 NOD. (*Id*. ¶ 36.)

The Grievance was received by DOCCS's Bureau of Labor Relations on May 10, 2018. (*Id*.

¶ 37.) On May 22, 2018, Plaintiff served a Notice of Claim (the "Notice") upon DOCCS. (*Id*.

¶ 79.) The Notice claimed, among other things, that "[t]he [a]dministration of [BHCF] is

determined to terminate [Plaintiff] because of his continued vocal protest of the unjust and

discriminatory behavior in the allocation of overtime to [BHCF] employees, so that 'immigrant

employees' receive little [or] . . . no overtime while 'American born employees' receive

essentially all of the allotted overtime." (*Id*. ¶ 80; *id*. Ex. C ("Notice") 16 (Dkt. No. 19-1).)

On June 12, 2018, DOCCS issued a second NOD to Plaintiff (the "June 2018 NOD").

(AC ¶ 52.) This NOD was the basis on which Plaintiff's employment was terminated in late

2018 or early 2019. (*Id*. ¶¶ 52, 70.) However, Plaintiff never personally received it. (*Id*. ¶ 53.)

This is apparently because the June 2018 NOD and related paperwork were sent to an old

address that Plaintiff had stopped using. (*Id*. ¶¶ 71–72.) Both before and after the June 2018

NOD, Plaintiff received paperwork at his proper address from DOCCS and other New York

State entities, including the April 2018 NOD, a third NOD filed on July 26, 2018, and payroll,

benefit, and tax documents. (*Id*. ¶¶ 57, 59, 73.) In addition, the Grievance, the Notice, and

Plaintiff's Equal Employment Opportunity Commission charge ("EEOC" and the "EEOC

Charge")—transmitted to DPA and DOCCS's Bureau of Labor Relations on August 2, 2018, (*id*.

¶ 60; *id*. Ex. A ("EEOC Charge") 2 (Dkt. No. 19-1))—contained Plaintiff's correct address, (AC

¶ 74). Further, Plaintiff's counsel communicated with numerous DOCCS representatives

between the issuance of the June 2018 NOD and Plaintiff's termination. (*See id.* ¶¶ 61, 62.) This included scheduling arbitration related to the EEOC Charge, (*id.* ¶ 61), and communications regarding a demand for arbitration and requests for discovery related to the July 2018 NOD, (*id.* ¶ 62). During these extensive conversations, DOCCS's representatives did not mention the June 2018 NOD, or the possibility that Plaintiff would be dismissed on this basis. (*Id.* ¶ 63.) In November 2018, Plaintiff became aware of the possibility of another NOD, as well as the possibility that DOCCS was planning to terminate Plaintiff for failing to respond to it. (*Id.* ¶ 65.) Plaintiff's counsel on November 26, 2018 emailed DOCCS's attorney Matthew Bloomingdale ("Bloomingdale") requesting among other things correspondence or documentation regarding Plaintiff's termination. (*Id.* ¶ 66.) Plaintiff's counsel sent follow-up emails on December 4, 2018 and December 7, 2018. (*Id.* ¶ 67.) Only at this point did Bloomingdale respond, noting that Plaintiff was terminated for failure to respond to or appeal the June 2018 NOD. (*Id.* ¶ 68.) Plaintiff's counsel immediately responded requesting documentation related to this termination. (*Id.*) After follow-up emails on December 27, 2018 and January 2, 2019, Plaintiff's counsel was ultimately supplied with the requested documents on January 11, 2019. (*Id.* ¶¶ 69–70.)

Plaintiff brings discrimination and retaliation claims against DOCCS pursuant to Title VII, (*id.* ¶¶ 81–104), discrimination and retaliation claims against Rushia pursuant to New York State Executive Law § 296 (the "Human Rights Law" or "NYSHRL"), (*id.* ¶¶ 105–30), a claim for intentional infliction of emotional distress ("IIED") against Rushia, (*id.* ¶¶ 131–36), and an equal protection claim pursuant to § 1983 against Rushia, (*id.* ¶¶ 137–40). Plaintiff seeks compensatory and punitive damages plus attorneys' fees and costs. (*Id.* at 21.)

B. Procedural Background

Plaintiff filed the Complaint on December 27, 2019, (Compl. (Dkt. No. 1)), fewer than 90 days after the EEOC mailed Plaintiff a Notice of Right to Sue on October 1, 2019, (AC ¶ 16; *id*. Ex. B ("EEOC Letter") 10 (Dkt. No. 19-1)). On March 12, 2020, Defendants filed a pre-motion letter arguing that Plaintiff's Complaint should be dismissed. (Dkt. No. 13.) Plaintiff replied by letter dated March 19, 2020, (Dkt. No. 14), and the Court scheduled a pre-motion conference, (Dkt. No. 15). At the pre-motion conference, rather than order a briefing schedule, the Court granted Plaintiff leave to file an amended complaint. (*See* Dkt. (minute entry for June 9, 2020).) Plaintiff filed his Amended Complaint on July 8, 2020. (AC.) Defendants filed a second pre-motion letter on July 21, 2020, (Dkt. No. 21), and Plaintiff replied on July 28, 2020, (Dkt. No. 22). The Court held a pre-motion conference on September 24, 2020, (*see* Dkt. (minute entry for Sep. 24, 2020)), at which it adopted a briefing schedule for the instant Motion, (Dkt. No. 25). Defendants submitted their Motion on October 24, 2020. (Not. of Mot.; Mem. of Law in Supp. of Defs.' Mot. ("Defs.' Mem.") (Dkt. No. 27).) After requesting and receiving an extension of time, (*see* Dkt. Nos. 28, 29), Plaintiff on December 22, 2020, submitted his Opposition brief. (Mem. of Law. in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 30).) Defendants submitted their Reply brief on January 5, 2021. (Reply Mem. of Law in Further Supp. of Defs.' Mot. ("Defs.' Reply") (Dkt. No. 31).)

II. Analysis

A. Standard of Review

"The standards of review for a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim are 'substantively identical.'"

*Gonzalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)).

### 1. Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (quotation marks omitted). "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quotation marks omitted), *aff'd*, 561 U.S. 247 (2010); *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014) (describing subject matter jurisdiction as the "threshold question" (quotation marks omitted)).

The Second Circuit has explained that a challenge to subject-matter jurisdiction pursuant to Rule 12(b)(1) may be facial or fact-based. *See Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). When a defendant raises a facial challenge to standing based solely on the complaint and the documents attached to it, "the plaintiff has no evidentiary burden" and a court must determine whether the plaintiff asserting standing "alleges facts that affirmatively and plausibly suggest that the plaintiff has standing to sue." *Id.* (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)). In making such a determination, a court must accept as true all allegations in the complaint and draw all inferences in the plaintiff's favor. *Id.* at 57. However, where a Rule 12(b)(1) motion is fact-based and a defendant proffers evidence outside the pleadings a plaintiff must either come forward with controverting evidence or rest on the pleadings if the evidence offered by the defendant is immaterial. *See Katz v.*

*Donna Karan Co., LLC*, 872 F.3d 114, 119 (2d Cir. 2017). If the extrinsic evidence presented by the defendant is material and controverted, the Court must make findings of fact in aid of its decision as to standing. *See Carter*, 822 F.3d at 57. Here, Rushia raises facial challenges to jurisdiction.

### 2. Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not

'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

B.  Application

Defendants argue, pursuant to Rule 12(b)(1), that the Court lacks subject matter jurisdiction over claims against Rushia in his official capacity, (Defs.' Mem. 7–8), and under state law, (*id*. at 8–9). Defendants argue, pursuant to Rule 12(b)(6), that Plaintiff fails to state a claim for IIED, (*id*. at 9–10), or under § 1983, (*id*. at 17–19), and that Rushia is entitled to qualified immunity, (*id*. at 19–20). Defendants further argue, pursuant to Rule 12(b)(6), that Plaintiff fails to state a claim under Title VII and NYSHRL of hostile work environment, (*id*. at 10–12), discrimination, (*id*. at 12–15), or retaliation, (*id*. at 15–17). Defendants argue separately that the Court should dismiss Plaintiff's demand for punitive damages. (*Id.* at 20–21.) The

Court considers Defendants' jurisdictional arguments pursuant to Rule 12(b)(1), and then

considers Defendants' arguments that Plaintiff fails to state a claim pursuant to Rule 12(b)(6).

*See Baldessarre v. Monroe-Woodbury Cent. Sch. Dist.*, 820 F. Supp. 2d 490, 499 (S.D.N.Y.

2011) (citing *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990)),

*aff'd*, 496 F. App'x 131 (2d Cir. 2012).

### 1. Official Capacity Claims

Defendants argue that the Court lacks subject matter jurisdiction over claims against

Rushia in his official capacity.  (*Id*. at 7–8.)  The Court agrees.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be

construed to extend to any suit in law or equity, commenced or prosecuted against one of the

United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S.

Const. amend. XI.  Generally, a state cannot be sued in federal court unless it has waived—or

Congress has properly abrogated—its Eleventh Amendment sovereign immunity.  *See Gollomp*

*v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009); *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of*

*Educ.*, 466 F.3d 232, 236 (2d Cir. 2006).  This immunity extends "beyond the states themselves

to state agents and state instrumentalities that are, effectively, arms of a state."  *Gollomp*, 568

F.3d at 366 (quoting *Woods*, 466 F.3d at 236).  Thus, barring waiver or abrogation, state officials

are immune from suits for monetary damages in their official capacity, *see Ford v. Reynolds*, 316

F.3d 351, 354 (2d Cir. 2003), including for causes of action brought pursuant to state law, *see*

*Seitz v. New York State*, No. 18-CV-4149, 2019 WL 4805257, at *8 (E.D.N.Y. Sept. 30, 2019).

"New York has not waived its Eleventh Amendment immunity to suit in federal court, and

Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983."  *Megginson v.*

*New York*, No. 19-CV-7583, 2019 WL 4194497, at *1 (S.D.N.Y. Sept. 4, 2019).  Thus,

Plaintiff's claims against Rushia in his official capacity are dismissed.

### 2.  Section 24 Immunity

Defendants argue that Rushia is immune to suit on state law grounds because he is

immune under New York Corrections Law § 24 ("Section 24").  (Defs.' Mem. 8–9.)  The Court

agrees as to Plaintiff's claims of improper allocation of overtime and report of misconduct

resulting in the April 2018 NOD, but disagrees as to Plaintiff's claims of verbal harassment and

filing a false criminal complaint.

Section 24 provides that "[n]o civil action shall be brought in any court of the state . . .

against any officer or employee of the department . . . in his or her personal capacity, for

damages arising out of any act done . . . within the scope of the employment . . . ."  N.Y.

Correct. Law § 24(1) (2011).  While the statute only references actions filed in state court,

Section 24 "has been interpreted to 'preclude the assertion of such claims in any court,

including the federal courts.'"  *White v. Montesano*, 466 F. Supp. 3d 331, 335 (W.D.N.Y. 2020)

(alterations omitted) (quoting *Baker v. Coughlin*, 77 F.3d 12, 15 (2d Cir. 1996)).  Federal courts

apply state substantive law in deciding pendent state law claims.  *See Guar. Tr. Co. of N.Y. v.*

*York*, 326 U.S. 99, 108–09 (1945); *see also Promisel v. First Am. Artificial Flowers, Inc.,* 943

F.2d 251, 257 (2d Cir. 1991) ("In applying pendent jurisdiction, federal courts are bound to

apply state substantive law to the state claim.").

Section 24 provides broad immunity to correction department employees and is not

limited to actions filed against employees by inmates.  *See Prignoli v. City of New York*, No. 94-

CV-4125, 1996 WL 340001, at *5 n.7 (S.D.N.Y. June 19, 1996).  The immunity shields

employees from personal liability from any state law claim for damages related to actions

falling within the scope of their employment. *See Ierardi v. Sisco*, 119 F.3d 183, 186 (2d Cir. 1997). The underlying purpose of Section 24 is to allow correction department employees to perform their duties without fear of civil actions being brought against them. *Id.* at 187.

Employees are considered to be acting within the scope of their employment so long as they are carrying out their assigned duties, "no matter how irregularly, or with what disregard of instructions." *Cepeda v. Coughlin*, 513 N.Y.S.2d 528, 530 (App. Div. 1987) (citation omitted). Employees, however, are not found to be acting within their employment scope when their conduct, while in the course of employment, is "for purely personal reasons unrelated to the employer's interests" and "a substantial departure from the normal methods of performing [their] duties." *White,* 466 F. Supp. 3d at 335 (citation omitted); *see also Johnson v. N.Y. State Dep't of Corr. Servs. & Cmty. Supervision*, No. 11-CV-79, 2013 WL 5347468, at *2 (W.D.N.Y. 2013) (same).

The New York Court of Appeals has established five factors to weigh in determining if an employee's actions fall within the scope of their employment. *Riviello v. Waldron*, 391 N.E.2d 1278, 1281 (N.Y. 1979). These factors include:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Id.* All five factors should be considered and weighed, "including the commonness of the conduct under scrutiny within the *particular* workplace." *Ierardi*, 119 F.3d at 188 (emphasis added).

Rushia is immune under Section 24 from Plaintiff's state law claims related to allocation of overtime. Plaintiff alleges that Rushia "was involved in" a discriminatory scheme with

DOCCS to favor non-immigrant employees over immigrants when delegating overtime work and pay. (AC ¶¶ 25, 27.) Plaintiff received less overtime and less pay than non-immigrant co-workers, which he argues was due to his Italian immigrant status. (*Id.* ¶¶ 24–25.) Plaintiff further alleges that Rushia unjustly and falsely accused Plaintiff of threats and harassment, which resulted in the April 2018 NOD. (*Id.* ¶¶ 29–31.) New York courts have held that "[a] supervisor's abuse of authority 'for the purpose[] of harassment . . . constitutes no more of a departure from the normal methods of performing the duties of employment than a correction officer's use of excessive force to quell an inmate disturbance . . . .'" *Johnson*, 2013 WL 5347468, at *3 (quoting *Gore v. Kuhlman*, 630 N.Y.S.2d 141, 142 (App. Div. 1995)). In *Gore*, a correction facility employee alleged that his supervisors intentionally abused their authority in order to harass him. 630 N.Y.S.2d at 142. The court found the allegations of denied leave requests fell within the defendants' supervisory authority, and the supervisors, therefore, were entitled to Section 24 immunity. *Id.*; *see also Borrello v. N.Y. State Dep't of Corr. Servs.*, No. 00-CV-177, 2004 WL 2191565, at *2–3 (W.D.N.Y. Sept. 27, 2004) (finding supervisor's denial of a promotion, transfer request, overtime work, pay increases, and favorable performance evaluations fell within the scope of employment and granting Section 24 immunity). Because delegating overtime work and pay and reporting misconduct are tasks that fall within a supervisor's scope of employment, Plaintiff's claims regarding Rushia's discriminatory overtime decisions are dismissed.

However, Rushia is not immune at this stage from Plaintiff's claims alleging discriminatory comments. Plaintiff alleges that Rushia created a hostile work environment through the continuous use of Italian slurs and other discriminatory comments. (AC ¶¶ 20–21.) Courts that have considered the issue have held that personal harassment unrelated to an

employee's assigned duties does not entitle a corrections department employee to Section 24 immunity. For example, in *Martin v. New York State Department of Correctional Services*, 224 F. Supp. 2d 434 (N.D.N.Y. 2002), a gay correctional facility employee sued his coworkers for sexual harassment and retaliation. *Id.* at 440. He alleged that his co-workers would regularly call him derogatory slurs, such as "pervert," "cock-sucker," and similarly degrading names. *Id.* at 441. He further alleged that his fellow employees would leave sexually explicit images around his work area and in the bathroom. *Id.* The court in *Martin* held that "alleged sexual harassment by co-workers does not entitle correctional officers to [S]ection 24 immunity because such conduct is not undertaken in the discharge of his or her duties." *Id.* at 442. Similarly, in *Ierardi*, a female special education teacher employed by the New York State Department of Correctional Services filed a sexual harassment suit against a corrections officer at her facility. 119 F.3d at 185. Her complaint alleged that her male coworker would often refer to her as "slut" or bitch," asked her to describe the undergarments she wore on several occasions, and once licked her face. *Id.* The court in *Ierardi* found this behavior departed from the normal course of discharging his duties, because the officer was "prompted purely by 'personal reasons unrelated to [his] employer's interest.'" *Id.* at 188 (citation omitted). Defendants argue that the plaintiffs in *Ierardi* and *Martin* claimed more egregious misconduct than does Plaintiff. (Defs.' Reply 3.) However, notwithstanding any possible difference in degree, Plaintiff's alleged statements were comparable in kind. Like the defendants in *Martin* and *Ierardi*, Rushia allegedly created a hostile work environment for Plaintiff with offensive and discriminatory comments. Rushia told Plaintiff to "go back to [his] own country," and used Italian slurs when talking to him. (AC ¶¶ 20–21.) None of these comments related to Rushia's job functions. As a result, Rushia is not entitled to Section 24 immunity for his alleged discriminatory comments.

Rushia likewise is not immune at this stage under state law from Plaintiff's claim that he filed a false criminal complaint. (*Id.* ¶¶ 31–32.) At the pleading stage, four of the five factors in *Riviello* suggest that this report fell outside the scope of Rushia's employment. *See* 391 N.E.2d at 1281. Regarding the first factor, the criminal complaint likely was filed at a police precinct, not in a DOCCS facility. Regarding the third, fourth, and fifth factors, supervisors do not commonly file false and retaliatory criminal complaints against their subordinates, which makes Rushia's alleged act a significant departure from his typical method of performance that DOCCS could not have reasonably anticipated. Although Rushia was Plaintiff's supervisor, the bare fact of this employment relationship does not suffice to establish that Rushia was acting within the scope of his duties. *See Ierardi*, 119 F.3d at 188 (finding that, "although occurring during the course of his employment," the defendant's conduct was "outside the scope of [his] employment"); *see also Brown v. New York*, No. 17-CV-1036, 2018 WL 3130593, at *5 (N.D.N.Y. June 26, 2018) (noting that the first and second factors "are not dispositive"). It is notable that Rushia is alleged to have filed a criminal complaint rather than acting pursuant to his workplace authority to recommend discipline or to himself discipline Plaintiff. (AC ¶ 31.) This distinguishes Rushia's false criminal complaint from his report resulting in the April 2018 NOD—workplace discipline for which Rushia is immune under Section 24. *See, e.g., Johnson*, 2013 WL 5347468, at *4 (finding supervisor that allegedly "created false allegations to support imposing discipline on [the] [p]laintiff" was immune under Section 24); *Gore*, 630 N.Y.S.2d at 142 (holding that "disciplinary action . . . fell within [the] defendants' authority as [the] plaintiff's supervisors").

### 3.  Hostile Work Environment

Defendants argue that Plaintiff fails to state a claim for hostile work environment, either against DOCCS under Title VII or against Rushia under NYSHRL.  (Defs.' Mem. 10–12.)  The Court disagrees.

Title VII "prohibits the creation of a hostile work environment."  *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013).  Of course, "[i]t is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through [other means], is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic," such as race or national origin.  *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  "In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (quotation marks omitted) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010)).  In considering whether a plaintiff has met this burden, courts consider "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether the conduct was physically threatening or humiliating, or a 'mere offensive utterance'; (4) whether the conduct unreasonably interfered with plaintiff's work; and (5) what psychological harm, if any, resulted."  *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (citation omitted).  "[Second Circuit] case law treats the first two of these factors—the frequency and the severity of the misconduct—as the principal focus of the analysis; the last three factors are specific considerations within the severity inquiry."  *Id*.  Moreover, the "test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an

16

objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citation and quotation marks omitted). Courts apply the same standards in evaluating discrimination claims under NYSHRL. *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010).

Here, Plaintiff alleges that his colleagues, including Rushia, told him to "go back to his own country," made many references to Plaintiff's immigrant status, claimed that his "guinea food stinks," and used Italian slurs. (AC ¶¶ 20–21.) "[R]acist comments, slurs, and jokes . . . constitute a hostile work environment" where there are "'more than a few isolated incidents of racial enmity,' meaning that 'instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.'" *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citations and alteration omitted). In evaluating whether such comments create a hostile work environment, courts consider their frequency and severity. *Id*. at 110–11 ("[W]hether racial slurs constitute a hostile work environment typically depends upon 'the quantity, frequency, and severity' of those slurs, considered 'cumulatively in order to obtain a realistic view of the work environment.'" (citations omitted)). Plaintiff has alleged that these comments were sufficiently frequent. He claims that he experienced "many" such comments, (AC ¶ 20), and that they "continued unchecked," (*id*. ¶¶ 19, 23), "[t]hroughout his employment," (*id*. ¶ 19), which spanned from 2002 through at least 2018, (*id*. ¶¶ 18, 52). These allegations suffice at this stage to establish that the comments were sufficiently frequent, even though "the Amended Complaint 'is not entirely specific about the exact dates of certain incidents.'" *Ward v. Shaddock*, No. 14-CV-7660, 2016 WL 4371752, at *7 (S.D.N.Y. Aug. 11, 2016) (holding that the plaintiff

sufficiently alleged a hostile work environment claim by alleging "a pattern of racial slurs and derogatory remarks . . . over the course of at least seven years").

The Court reaches the same conclusion regarding the alleged comments' severity. Where there is a prolonged pattern of slurs and demands that a plaintiff return to his or her country, courts have found that these comments are "much more than isolated incidents of racial enmity," and suffice to establish a hostile work environment claim. *Wishner v. Cont'l Airlines*, No. 94-CV-8239, 1997 WL 615401, at *2 (S.D.N.Y. Oct. 6, 1997) (denying motion for summary judgment where the plaintiff presented evidence of "incidents of racial comments" and "the regular use of offensive racial epithets"); *see also Rios v. Buffalo & Fort Erie Pub. Bridge Auth*., No. 04-CV-375, 2007 WL 4991189, at *10 (W.D.N.Y. Sept. 7, 2007) (concluding that a jury could find a hostile work environment based on offensive cartoons, "repeated ethnic jokes by a supervisor," and similarly racist comments), *report and recommendation adopted*, 2008 WL 657121 (W.D.N.Y. Mar. 7, 2008), *aff'd*, 326 F. App'x 612 (2d Cir. 2009); *Brewster v. City of Poughkeepsie*, 447 F. Supp. 2d 342, 349 (S.D.N.Y. 2006) (upholding a jury verdict on the plaintiff's hostile work environment claim where the plaintiff and others testified to statements including "[g]o back to your own country if you want to speak Spanish"); *cf. Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70–71 (2d Cir. 2000) (holding that evidence of "a stream of racially offensive comments," including one that "was physically threatening," sufficed to survive summary judgment). Where courts have reached the opposite conclusion, it has been where the plaintiff alleged one or a small number of such comments. *See Obi v. Westchester Med. Reg'l Physician Servs., P.C.*, No. 19-CV-3022, 2020 WL 1434159, at *8 (S.D.N.Y. Mar. 23, 2020) (noting the "infrequent and sporadic nature of the remarks at issue"); *Kalola v. Int'l Bus. Machs. Corp*., No. 13-CV-7339, 2015 WL 861718, at *9 (S.D.N.Y. Feb. 3,

2015) (dismissing claim where the plaintiff "only allege[d] two specific episodes of harassment or abuse based on his race"); *Salmon v. Pliant Corp.*, 965 F. Supp. 2d 302, 306 (W.D.N.Y. 2013) (noting that the "plaintiff's allegations describe isolated incidents"); *Ogbo v. N.Y. State Dep't of Fin.*, No. 99-CV-9387, 2001 WL 986546, at *7 (S.D.N.Y. Aug. 28, 2001) (finding that "five comments over a two year period are insufficient" to make out a hostile work environment claim), *aff'd*, 45 F. App'x 58 (2d Cir. 2002); *see also Chukwuka v. City of New York*, 513 F. App'x 34, 36–37 (2d Cir. 2013) (summary order) (holding that "three events—which were spread out over a year—were not 'sufficiently continuous and concerted'" to establish a hostile work environment claim (citation omitted)); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118–19 (2d Cir. 2010) (summary order) (holding that "while [a racially harassing] comment may be seen as severe, it is isolated" and noting that the Second Circuit has "found a hostile work environment only where such a racially-harassing comment is one of many racially-motivated comments"). Thus, Defendants' Motion is denied with respect to Plaintiff's hostile work environment claims.[2]

### 4. Discrimination

Defendants argue that Plaintiff fails to state a claim for discrimination, either against DOCCS under Title VII or against Rushia under NYSHRL. (Defs.' Mem. 12–15.) The Court agrees.

---

[2] To the extent Defendants argue that Rushia is shielded by qualified immunity, (*see* Defs.' Mem. 19–20), they merely recite the qualified immunity case law without meaningfully applying it to the facts of the case. In applying the law, Defendants merely repeat arguments from earlier in their brief. (*Id.* at 20.) Notably, Defendants do not argue that Rushia is entitled to qualified immunity for Plaintiff's hostile work environment claim. (*Id.*) "The Court therefore declines to consider at this time whether [Rushia is] protected by qualified immunity." *Osorio v. Westchester County*, No. 18-CV-5620, 2019 WL 3958443, at *1 (S.D.N.Y. Aug. 21, 2019).

Title VII makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "The substantive standards applicable to claims of employment discrimination under Title VII . . . are . . . well established." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). To state a prima facie case of discrimination under Title VII, a plaintiff "must show: (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *see also Borzon v. Green*, No. 16-CV-7385, 2018 WL 3212419, at *7 (S.D.N.Y. June 29, 2018) (same), *aff'd*, 778 F. App'x 16 (2d Cir. 2019). To satisfy the fourth requirement—the only one that Defendants challenge—"[a]n inference of discrimination can arise from circumstances including, but not limited to, 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009)). "The NYSHRL mirrors these federal obligations." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014).

Defendants argue that Plaintiff "fails to plausibly allege a discriminatory motive for his termination." (Defs.' Mem. 14; *see* AC ¶ 50 (alleging that Plaintiff was terminated).)[3] The

---

[3] Termination is an adverse employment action under Title VII. *See Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (identifying termination as a materially adverse employment action); *Opoku v. Brega*, No. 15-CV-2213, 2016 WL 5720807, at *7 (S.D.N.Y.

Court agrees.  Plaintiff repeatedly asserts that he was terminated because of his national origin. (*See, e.g.*, AC ¶¶ 54 ("[P]laintiff's termination [was] part of the pattern of . . . discrimination . . . ."), 82 ("Defendants . . . terminated [P]laintiff's employment based upon his national origin . . . ."), 94 (same).)  Standing alone, these allegations are only "naked assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (alteration and quotation marks omitted), and these conclusory statements do not "nudge[ ] [Plaintiff's] claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570.

Defendants further argue that the comments by Plaintiff's colleagues about his national origin do not make Plaintiff's discrimination claim plausible.  (Defs.' Mem. 13.)  As discussed, "the employer's criticism of the plaintiff's performance in ethnically degrading terms[] or its invidious comments about others in the employee's protected group" may allow for an inference of discrimination.  *Littlejohn*, 795 F.3d at 312.  In determining whether remarks are probative of discriminatory intent, courts consider

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry v. Wyeth Pharms., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010); *see also Moore v. Verizon*, No. 13-CV-6467, 2016 WL 825001, at *8 (S.D.N.Y. Feb. 5, 2016) (articulating the same standard). Here, Plaintiff alleges that his co-workers, including Rushia, told him to "go back to his own country," made numerous references to Plaintiff's immigrant status, commented that his "guinea food stinks," and used Italian slurs.  (AC ¶¶ 20–21 (alterations omitted).)  While degrading, these

---

Sept. 30, 2016) (identifying termination as the "quintessential materially adverse employment action" (citation omitted)).

comments are unrelated to Plaintiff's job performance or decisions regarding Plaintiff's employment. (*Id.*) That fact distinguishes the Amended Complaint from others where courts have held that comments by a supervisor support the inference of discrimination. *See Rose v. N.Y.C. Bd. of Educ.*, 257 F.3d 156, 160, 162 (2d Cir. 2001) (holding that a supervisor's statement "that he would replace [the plaintiff] with someone younger and cheaper" could support an inference of discrimination); *Dupree v. UHAB-Sterling St. Hous. Dev. Fund Corp.*, No. 10-CV-1894, 2012 WL 3288234, at *7 (E.D.N.Y. Aug. 10, 2012) (holding that the plaintiff's supervisor's statement that "the [d]efendants 'are not hiring black Americans' could support an inference that [the plaintiff's] discharge was motivated by racial discrimination"); *Gomez v. N.Y.C. Dep't of Educ.*, No. 06-CV-2741, 2009 WL 2058805, at *9 (E.D.N.Y. July 16, 2009) (finding that a supervisor's statement that the plaintiff "would be denied tenure because she [was] Hispanic" could support an inference of discrimination). Further, while Plaintiff alleges that Rushia was his supervisor, (*id.* ¶ 12), he does not allege that Rushia "had any decision-making authority with respect to" his termination, and thus "cannot establish an inference of discrimination as to any complained of discrete and materially adverse employment actions taken by [DOCCS] management," *Paul v. Postgraduate Ctr. for Mental Health*, 97 F. Supp. 3d 141, 170–71 (E.D.N.Y. 2015). Even taken as true, the allegations in the Amended Complaint do not plausibly show that Rushia could "be found to have aided and abetted or to have been personally involved in these employment decisions." *Moore v. City of New York*, No. 15-CV-6600, 2017 WL 35450, at *24 (S.D.N.Y. Jan. 3, 2017), *report and recommendation adopted*, 2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017). Thus, Plaintiff has "not establish[ed] a connection between these [comments] and the decision-making process resulting in [his] discipline." *Fukelman v. Delta Air Lines, Inc.*, No. 18-CV-2, 2020 WL 4587496, at *11 (E.D.N.Y. Apr. 13, 2020), *report*

*and recommendation adopted*, 2020 WL 2781662 (E.D.N.Y. May 29, 2020), *appeal dismissed* (Sept. 25, 2020). Indeed, the alleged basis for Plaintiff's termination was his failure to reply to the June 2018 NOD, (AC ¶ 52), but Plaintiff does *not* allege that Rushia had any involvement with this NOD or that any discriminatory comments were made by the person who wrote up the NOD, (*id*. ¶ 58 (stating that the June 2018 NOD accused Plaintiff of "communicat[ing] with a colleague in a demeaning, harassing[,] and discourteous matter," and not naming the colleague)). Thus, Plaintiff's claim of discriminatory termination is dismissed. *See Rubert v. King*, No. 19-CV-2781, 2020 WL 5751513, at *7 (S.D.N.Y. Sept. 25, 2020) (dismissing a similar claim where the plaintiff "point[ed] to no racially discriminatory statements or conduct by . . . anyone conceivably involved in the decision to fire him"); *Moore*, 2016 WL 825001, at *8–9 (holding that a supervisor's comments about the plaintiff's age were "non-actionable stray remarks" where the plaintiff did "not allege that [her supervisor or her supervisor's] statements played any part in [the] [p]laintiff's alleged adverse employment actions"); *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 438 (S.D.N.Y. 2015) (dismissing employment discrimination claim where the plaintiffs supervisor made discriminatory comments in part because "the [c]omplaint [did] not allege that the remarks were 'related to the decision-making process' resulting in [the] [p]laintiff's termination").

As discussed, "more favorable treatment of employees not in the protected group" can lead to an inference of discrimination. *Littlejohn*, 795 F.3d at 312. To rebut this possibility, Defendants separately argue that Plaintiff "fails to allege that he was treated differently from similarly situated co-workers." (Defs.' Mem. 13.) This argument applies to Plaintiff's claim that Defendants had a "scheme to discriminatorily delegate a higher proportion of overtime work and

pay to non-immigrants over immigrants." (AC ¶ 27.)[4]  Where a plaintiff "seeks to make out [his]

prima facie case by pointing to the disparate treatment of a purportedly similarly situated

employee, . . . [that] employee 'must be similarly situated in all material respects.'"  *McGuinness*

*v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (citation and emphasis omitted).  Here, "Plaintiff

has not met his burden of offering similarly situated employees outside of his protected class."

*Wooding v. Winthrop Univ. Hosp.*, No. 16-CV-4477, 2017 WL 2559942, at *10 (E.D.N.Y. June

12, 2017).  The Amended Complaint identifies only Rushia as benefitting from DOCCS's

alleged discriminatory overtime allocation.  (*See* AC ¶ 27.)  However, rather than claiming that

Rushia and Plaintiff are materially comparable, the Amended Complaint identifies Rushia as

Plaintiff's supervisor, (*id*. ¶ 12), and is "otherwise silent as to . . . comparators," such as "what

[his] responsibilities were, how [his] workplace conduct compared to [Plaintiff's], or how [he

was] treated [with respect to overtime]," *Henry v. N.Y.C. Health & Hosp. Corp.*, 18 F. Supp. 3d

396, 408 (S.D.N.Y. 2014).  The Amended Complaint's general claim that Defendants favor

"non-immigrants over immigrants," (AC ¶ 27), likewise "do[es] not satisfy Plaintiff's burden to

allege that there were employees" receiving more favorable treatment who, apart from their

national origin, were similarly situated in all material respects, *Olivier v. County of Rockland*,

No. 15-CV-8337, 2018 WL 401187, at *8 (S.D.N.Y. Jan. 11, 2018); *see also Blige v. City Univ.

of N.Y.*, No. 15-CV-8873, 2017 WL 498580, at *9 (S.D.N.Y. Jan. 19, 2017) ("Numerous courts

within the Second Circuit have granted motions to dismiss disparate treatment claims 'where the

complaint was entirely devoid of any details regarding the purported comparators, e.g., who they

are, what their positions or responsibilities were at the company, how their conduct compared to

---

[4] "[D]enial of overtime can constitute an adverse employment action."  *Mazyck v. Metro. Transp. Auth.*, 893 F. Supp. 2d 574, 589 (S.D.N.Y. 2012).

plaintiffs'[,] or how they were treated differently by defendants.'" (citation, italics, and alterations omitted)). Thus, Plaintiff's claims of discriminatory overtime assignment are dismissed.[5],[6]

### 5. Retaliation

Defendants argue that Plaintiff fails to state a claim for retaliation, either against DOCCS under Title VII or against Rushia under NYSHRL. (Defs.' Mem. 15–17.) The Court disagrees as to DOCCS, but agrees as to Rushia.

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). In other words, "Title VII forbids an employer to retaliate against an employee for . . . complaining of employment discrimination prohibited by Title VII." *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006). To state a claim, a plaintiff must establish that: "[1] a plaintiff was engaged in protected activity; [2] the alleged retaliator knew that [the] plaintiff was involved in protected activity; [3] an adverse decision or course of action was taken against [the] plaintiff; and [4] a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002) (citation omitted); *accord McGuire-Welch v. House of the Good Shepherd*, 720 F. App'x 58, 62 (2d Cir. 2018) (summary

---

[5] While the Court has found that Rushia is immune from claims related to the allocation of overtime pursuant to Section 24, *see supra*, the Court rules on this alternate basis as well, with respect to both Plaintiff's NYSHRL and § 1983 claims.

[6] The Amended Complaint alleges that DOCCS sought to "deprive [P]laintiff of his pistol license." (AC ¶ 77.) Plaintiff does not argue that this decision suggests illegal discrimination or was made due to Plaintiff's national origin or protected conduct. (*See generally* Pl.'s Mem.) Thus, the Court does not consider this claim for purposes of adjudicating the instant Motion.

order).  "A plaintiff's burden at this prima facie stage is de minimis."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (italics omitted).  Retaliation claims under § 1983 and the NYSHRL are subject to the same standard.  *See Goonewardena v. N.Y. Workers Comp. Bd.*, 258 F. Supp. 3d 326, 343–44 (S.D.N.Y. 2017) (treating retaliation claims under Title VII, § 1983, and the NYSHRL under the same standard), *aff'd*,  788 F. App'x 779 (2d. Cir. 2019).  The Court therefore evaluates the substance of each of Plaintiff's retaliation claims—whether under Title VII, § 1983, or the NYSHRL—congruently.

### a.  DOCCS

Plaintiff alleges that he served upon DOCCS the Notice, which complained that DOCCS discriminated against Plaintiff because of his national origin.  (AC ¶ 80; Notice 16.)  This "complain[t] of employment discrimination prohibited by Title VII" was protected activity of which DOCCS was aware, satisfying the first two elements.  *Kessler*, 461 F.3d at 205.  Plaintiff satisfies the third element by alleging that DOCCS issued the June 2018 NOD.  (*See* AC ¶ 52.)  In circumstances where a plaintiff alleges that he or she suffered actual "employment consequences" due to an investigation—as Plaintiff did here, since he alleges that he was terminated as a result of the procedurally flawed June 2018 NOD—"an adverse employment action may be found" from the investigation itself.  *Anemone v. Metro. Transp. Auth.*, 410 F. Supp. 2d 255, 266–68 (S.D.N.Y. 2006) (finding that, "[a]lthough dismissal may be warranted at a later stage of the proceedings," the plaintiff had sufficiently alleged a retaliation claim where the plaintiff claimed to be the subject of a "retaliatory investigation" leading to suspension and termination that began "less than a month" after the plaintiff engaged in the alleged protected activity) (collecting cases)).  This is particularly true because Plaintiff alleges that he received no

documents related to the June 2018 NOD until he had already been terminated, (AC ¶ 53), even though DOCCS sent other NODs and paperwork to the proper address, (*id.* ¶ 73), received paperwork containing the proper address, (*id.* ¶ 74), and was in frequent contact with Plaintiff's attorney, (*id.* ¶ 63). These procedural irregularities support the view that the June 2018 NOD was itself an adverse action. *See Cox v. Onondaga Cnty. Sheriff's Dep't*, 760 F.3d 139, 147 (2d Cir. 2014) (noting that "an employer's investigation may constitute a cognizable retaliatory action if carried out so as to result in . . . constructive discharge . . . , or if conducted in such an egregious manner as to 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006))).

Defendants contest the fourth requirement: that Plaintiff establish "a causal connection . . . between the protected activity and the adverse action." *Weixel*, 287 F.3d at 148. (*See* Defs.' Mem. 15–16.)

> [T]o establish the last element of a prima facie case of retaliation, [Plaintiff] must show that the allegedly adverse actions occurred in circumstances from which a reasonable jury could infer retaliatory intent. [The Second Circuit has] held that a close temporal relationship between a plaintiff's participation in protected activity and [a defendant's] adverse actions can be sufficient to establish causation.

*Treglia*, 313 F.3d at 720; *see also Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (citation and quotation marks omitted)); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998) (holding that "less than two months" between protected activity and allegedly adverse action were sufficient to establish causation), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002). A plaintiff's "presentation of a temporal connection" can be "enough, in and of itself . . . to permit a reasonable jury to find causation."

*Summa v. Hofstra Univ.*, 708 F.3d 115, 127 (2d Cir. 2013). Although the Second Circuit has not established a "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action," a court must "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases," *id.* at 128 (citation omitted), and a lengthy gap between the alleged protected activity and alleged adverse employment action can "suggest[], by itself, no causality at all," *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001).

Here, Plaintiff alleges that he served the Notice upon DOCCS on May 22, 2018. (AC ¶ 79.) The June 2018 NOD was issued on June 12, 2018. (*Id*. ¶ 52.) Less than a month passed between the alleged protected activity and alleged adverse action. (*See* Pl.'s Mem. 4 ("[P]laintiff served [the] Notice . . . *just weeks before* the [June 2018 NOD] was sent to the wrong address, starting the final termination process . . . ." (emphasis in original).) Courts in this District and other district courts in the Second Circuit have allowed retaliation claims with longer gaps of time between protected activity and adverse employment action to survive a motion to dismiss. *See, e.g.*, *Wallace v. Esper*, No. 18-CV-6525, 2019 WL 4805813, at *9 (S.D.N.Y. Sept. 30, 2019) (denying the defendant's motion to dismiss as to a retaliation claim pertaining to acts of retaliation that occurred two and three months after the plaintiff engaged in protected activity); *Murray v. Dutchess Cnty. Exec. Branch*, No. 17-CV-9121, 2019 WL 4688602, at *13 (S.D.N.Y. Sept. 25, 2019) (holding that the plaintiff's allegation of a two-to-three-month gap between "engaging in protected activity" and employment termination was "sufficiently narrow, at the motion-to-dismiss stage, to satisfy the requisite causal connection" (collecting cases)); *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 785–86 (S.D.N.Y. 2019) (finding

that a gap of eight months between the alleged protected activity and alleged retaliatory conduct may be sufficient to allow an inference of causation); *Dawson v. City of New York*, No. 09-CV-5348, 2013 WL 4504620, at *18 (S.D.N.Y. Aug. 19, 2013) (noting that "[w]hile the Second Circuit has not established a 'bright line rule' with respect to the limits of temporal proximity, three months falls within the time period sufficient to permit an inference of retaliation"); *Reuland v. Hynes*, No. 01-CV-5661, 2004 WL 1354467, at *11 (E.D.N.Y. June 17, 2004) (finding that a four-and-a-half month gap between the protected activity and adverse employment action does not preclude a causal connection). Accordingly, the Amended Complaint sufficiently alleges a causal connection based on temporal proximity.[7] Plaintiff's Title VII retaliation claim against DOCCS may proceed to discovery. (*See* AC ¶¶ 93–104.)[8]

### b. Rushia

The opposite is the case for Plaintiff's NYSHRL retaliation claim against Rushia. (*Id.* ¶¶ 118–30.) Plaintiff alleges that Rushia filed a false criminal complaint, charging that Plaintiff harassed him. (*Id.* ¶¶ 31–32.)[9] Plaintiff also alleges that he frequently complained about discrimination against foreign-born employees in overtime decisions. (*Id.* ¶ 23 (noting "many

---

[7] Defendants focus on the EEOC Charge, which they argue post-dated the June 2018 NOD, and preceded Plaintiff's termination by roughly five months. (*See* Defs.' Mem. 16.) Because Plaintiff's retaliation claim survives based solely on the Notice and June 2018 NOD, the Court makes no decision regarding whether Plaintiff plausibly alleges that the EEOC Charge caused DOCCS to retaliate by terminating him.

[8] Because it is not necessary at this stage, the Court makes no decision regarding whether Bloomingdale's non-responsiveness supports a finding that the Notice caused the June 2018 NOD and Plaintiff's subsequent termination. (*See* AC ¶¶ 64–70.)

[9] Because Defendants do not brief the issue, the Court assumes but does not decide that such a report is an adverse action. *See Henry*, 18 F. Supp. 3d at 407 (finding no adverse action where the defendants allegedly "wrote [the plaintiff] up on false charges of sleeping at work," but the complaint did not allege that the plaintiff "received any punishment as a result of these purportedly false charges" (alteration and record citation omitted)).

complaints to . . . Rushia"); *see also id.* ¶¶ 19 (noting "many complaints"), 26 ("Plaintiff

complained . . . about this unfair and discriminatory practice to no avail."), 46 (noting that, upon

returning from his injury, "Plaintiff again complained").)  However, Plaintiff makes no specific

claims about the timing of any complaint made to Rushia.  (*See generally id*.)  Alleging

complaints but not alleging detail about when these complaints were submitted does not establish

the "close temporal relationship" that is needed to plausibly allege causation.  *Treglia*, 313 F.3d

at 720; *see also Massaro v. Dep't of Educ. of City of N.Y.*, No. 17-CV-8191, 2018 WL 4333989,

at *4 (S.D.N.Y. Sept. 11, 2018) (finding the plaintiff's claim that "she ha[d] been discriminated

against and that the retaliation took place from August 2013 to . . . July 2016" was "insufficient

as a matter of law to infer retaliatory animus from temporal proximity" (quotation marks

omitted)), *aff'd in part, rev'd in part on other grounds and remanded sub nom. Massaro v. Bd. of

Educ. of City Sch. Dist. of City of N.Y.*, 774 F. App'x 18 (2d Cir. 2019); *Wang v. Palmisano*, 51

F. Supp. 3d 521, 541 (S.D.N.Y. 2014) (dismissing the complaint where, although the plaintiff

"alleged the dates on which he filed his complaints, he [did] not allege[] the dates on which [the]

[d]efendants" took adverse action); *Henry*, 18 F. Supp. 3d at 412 (granting a motion to dismiss

where the complaint alleged that the defendants retaliated against the plaintiff "when she

complained" and "after she complained," but where it "fail[ed] to state with even a modicum of

specificity when the relevant events occurred[,]" rendering the complaint's "conclusory

allegations . . . simply too vague in nature and non-specific as to time to serve as a basis for [the

plaintiff's] retaliation claims" (citation, alterations, and quotation marks omitted)).  Indeed, the

only complaint to which Plaintiff assigns a specific date that occurred before the April 2018

NOD was the 2014 Complaint, which Plaintiff filed more than four years before Rushia's alleged

false report.  (*See* AC ¶¶ 29, 39.)  Four years is too long to infer that the 2014 Complaint caused

the April 2018 NOD.  *See Clark Cnty. Sch. Dist.*, 532 U.S. at 274 ("Action taken . . . 20 months

later suggests, by itself, no causality at all.").  Thus, Plaintiff's retaliation claim against Rushia is

dismissed.[10],[11]

### 6.  IIED

Defendants argue that Plaintiff has not alleged the requisite extreme and outrageous

conduct to maintain an IIED claim against Rushia.  (Defs.' Mem. 9–10.)  The Court agrees.

Under New York law, an IIED claim "has four elements: (i) extreme and outrageous

conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional

---

[10] The Amended Complaint does not appear to allege that Rushia's derogatory comments were in retaliation for Plaintiff's complaints of discrimination.  (*See* AC ¶¶ 20–21.)  Indeed, the Amended Complaint alleges that Plaintiff complained in part about these comments, suggesting that the causal chain may run in the opposite direction.  (*See* AC ¶ 23 ("Despite many complaints . . . such [harassing] behavior continued unchecked.").)  Regardless, because Plaintiff "has provided no dates of these events, . . . the Court cannot determine" whether Rushia's comments occurred after Plaintiff's complaints of discrimination.  *Anand v. N.Y. State Dep't of Tax'n & Fin.*, No. 10-CV-5142, 2012 WL 2357720, at *6 (E.D.N.Y. June 18, 2012); *see also Cowan v. City of Mount Vernon*, No. 14-CV-8871, 2017 WL 1169667, at *12 (S.D.N.Y. Mar. 28, 2017) (holding that "without a clear timeline of . . . events" the court could not determine whether the protected activity and adverse action were "close enough in time to allow for an inference of causation").

[11] The Amended Complaint asserts several times that Rushia's actions were retaliatory.  (*See, e.g.*, AC ¶¶ 13 ("Rushia . . . participated in . . . retaliatory acts . . . ."), 14 ("Rushia . . . retaliat[ed] against [P]laintiff when [P]laintiff complained of . . . harassment and hostile acts."), 34 (alleging that Rushia's false claims of threats and harassment were "part of a continuing course of . . . retaliatory conduct"), 38 ("All . . . NODs were directly related to, instigated[,] and caused by[] [P]laintiff's complaints about . . . discriminatory acts."), 48 ("Soon after, and as a result of, his complaints about [Defendants'] discriminatory practices, [P]laintiff was retaliated against . . . ."), 51 ("[T]he retaliation escalated to the point that false criminal charges were made . . . .").)  These conclusory assertions do not suffice to state a retaliation claim under Title VII.  *See Wang*, 51 F. Supp. 3d at 539–40 (declining to credit the plaintiff's "wholly conclusory" allegation that the defendants acted with "retaliatory 'motives'"); *Laurent v. G & G Bus Serv., Inc.*, No. 10-CV-4055, 2011 WL 2693651, at *1 (S.D.N.Y. July 11, 2011) ("While the plaintiff repeats his conclusory allegations that he was . . . retaliated against in violation of . . . Title VII, he has failed to go beyond conclusory allegations that do not state plausible claims for violation of [Title VII].").

distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993). New York courts have been extremely reluctant to find extreme and outrageous conduct. *See Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983); *see also Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 158 (2d Cir. 2014) ("IIED . . . remains a highly disfavored tort under New York law." (citation, alteration, and quotation marks omitted)). Conduct qualifies as "extreme and outrageous" only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Murphy*, 448 N.E.2d at 90 (citation omitted). "The element of outrageous conduct is 'rigorous, and difficult to satisfy,' and its purpose is to filter out trivial complaints and assure that the claim of severe emotional distress is genuine." *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 488 (S.D.N.Y. 2013) (quoting *Howell*, 612 N.E.2d at 702). Applying this rigorous test, courts have found that the type of derogatory comments and slurs allegedly uttered by Rushia do not reach this high bar. *See Shukla v. Deloitte Consulting LLP*, No. 19-CV-10578, 2020 WL 3181785, at *13 (S.D.N.Y. June 15, 2020) (holding that "comments about [the plaintiff's] heritage made by senior managers" and "jokes or other comments . . . related to [the] [p]laintiff's national origin" did not state a claim for IIED); *Daniels v. Alvarado*, No. 03-CV-5832, 2004 WL 502561, at *6 (E.D.N.Y. Mar. 12, 2004) ("Racial slurs on their own do not constitute conduct so 'extreme and outrageous' in nature as to sustain a claim for intentional infliction of emotional distress."); *Rivera v. Baccarat, Inc.*, No. 95-CV-9478, 1996 WL 251850, at *3 (S.D.N.Y. May 10, 1996) (holding that "being ridiculed for [one's] accent, and . . . subjected to ethnic stereotyping . . . is . . . not actionable under the rubric of [IIED]"); *Leibowitz v. Bank Leumi Tr. Co. of N.Y.*, 548 N.Y.S.2d 513, 521 (App. Div. 1989) (affirming dismissal of

an IIED claim based on frequent "deplorable and reprehensible" "use of . . . religious and ethnic slurs"). Nor do Plaintiff's claims that Rushia brought false criminal charges against him. *See Truman v. Brown*, 434 F. Supp. 3d 100, 119 (S.D.N.Y. 2020) (holding that "false accusations of criminal conduct . . . do not inherently establish IIED"); *Nungesser v. Columbia Univ.*, 169 F. Supp. 3d 353, 375 (S.D.N.Y. 2016) (holding that "a false charge of sexual harassment does not rise to the level of outrage required under New York law" (citation and quotation marks omitted)); *Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 224 (E.D.N.Y. 2010) ("'[A]llegations of providing false information to the police do not suffice' for an IIED claim absent additional outrageous behavior." (citation and alteration omitted)). Thus, Plaintiff's IIED claim is dismissed.[12]

### 7. § 1983

Defendants argue that Plaintiff has not alleged a § 1983 claim against Rushia. (Defs.' Mem. 17–19.) The Court agrees in part. "Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012). Thus, to state a claim pursuant to § 1983, a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (citation omitted). Assuming without deciding that the "under color of state law [requirement] is established," Plaintiff's "equal protection claim parallels his Title VII claim." *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004). Other than the fact "that unlike a Title

---

[12] The Court does not consider Defendants' argument that the acts constituting the claimed IIED fall "outside the one year statute of limitations." (Defs.' Reply 5.)

VII claim a [§] 1983 claim can be brought against individuals," *id.* at 159 n.20, "[t]he elements

of one [claim] are generally the same as the elements of the other and the two must stand or fall

together," *id.* at 159.[13]  Indeed, Defendants argue in substance that Plaintiff's § 1983 claim

should be dismissed for the same reasons that his Title VII and NYSHRL discrimination, hostile

work environment, and retaliation claims should be dismissed.  (*See* Defs.' Mem. 17–19.)  Here,

the Court has concluded that the Amended Complaint does not state a NYSHRL claim for

discrimination or retaliation against Rushia.  *See supra*.  As a result, Plaintiff's § 1983 claim may

not proceed based on those theories.  *See Ortiz v. N.Y.C. Hous. Auth.*, No. 09-CV-1280, 2011

WL 4711881, at *11 (E.D.N.Y. Sept. 30, 2011) (entering summary judgment against the

plaintiff's § 1983 equal protection claims based on a finding that he "failed to meet the elements

of a Title VII violation").  However, Plaintiff's § 1983 claim based on a hostile work

environment may proceed to discovery.  *See Cole v. N.Y. State Dep't of Corr.*, No. 15-CV-876,

2017 WL 1194233, at *13–14 (N.D.N.Y. Mar. 30, 2017) (denying a motion to dismiss a § 1983

hostile work environment claim).

### 8.  Punitive Damages

Defendants argue that Plaintiff's request for punitive damages should be dismissed.

(Defs.' Mem. 20–21.)  At this stage and in light of the briefing, the Court disagrees.  Defendants

cite law regarding the recoverability of punitive damages pursuant to a § 1983 claim, *see Smith v.*

*Wade*, 461 U.S. 30, 56 (1983); *Amid v. Chase*, 720 F. App'x 6, 13 (2d Cir. 2017) (summary

order); *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 262 (2d Cir. 1997), and

pursuant to a breach of contract claim, *see N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*,

---

[13] The Court does not consider the differences between Title VII and § 1983 causes of action because Defendants do not argue that any are salient.  *See Naumovski v. Norris*, 934 F.3d 200, 212–15 (2d Cir. 2019) (discussing the differences between Title VII and § 1983 claims).

266 F.3d 112, 130 (2d Cir. 2001). However, they do not brief the law regarding the availability of punitive damages pursuant to a Title VII claim of hostile work environment. (*See* Defs.' Mem. 20–21.) More importantly, "[p]unitive damages are not a separate cause of action and, thus, courts generally find motions to strike punitive damages at the motion to dismiss stage to be premature." *Denis v. Home Depot, U.S.A., Inc.*, No. 10-CV-3227, 2014 WL 6632486, at *6 (E.D.N.Y. Nov. 21, 2014); *see also FMS Bonds, Inc. v. Bank of N.Y. Mellon*, No. 15-CV-9375, 2016 WL 4059155, at *17 (S.D.N.Y. July 28, 2016) ("The Court cannot resolve [the availability of punitive damages] on a motion to dismiss without a developed factual record."); *Willman v. Zelman & Assocs., LLC*, No. 11-CV-1216, 2012 WL 811512, at *5 (S.D.N.Y. Mar. 12, 2012) ("Whether or not punitive damages are proper here is not something this Court will decide at this stage of the proceedings and will instead await the conclusion of discovery and any motions for summary judgment."). Thus, the Motion is denied as premature with respect to Plaintiff's punitive damages claims.[14]

### 9. Plaintiff May Request Leave To Amend

Plaintiff requests that the Court "provide counsel with an opportunity to seek leave to amend the Complaint . . . ." (Pl.'s Mem. 17.) Defendants oppose this request. (Defs.' Reply 9–

---

[14] Several courts have found that government entities such as DOCCS are immune from punitive damages claims under Title VII. *See Wood v. Sophie Davis Sch.*, No. 02-CV-7781, 2003 WL 21507579, at *4 (S.D.N.Y. June 30, 2003) ("[A]s an . . . arm of the state, [the defendant] is immune from punitive damages."); *Parrow v. City of Syracuse*, No. 95-CV-715, 1997 WL 538901, at *8 (N.D.N.Y. Aug. 27, 1997) ("Title VII prohibits punitive damages against governmental defendants."); *see also* 42 U.S.C. § 1981a(b)(1) ("A complaining party may recover punitive damages under [Title VII] against a respondent (other than a government, government agency or political subdivision) . . . ."). However, because the Parties do not brief the availability of punitive damages against DOCCS under Title VII, the Court does not consider granting the Motion on this basis. *See Gavigan v. Commissioner*, No. 06-CV-942, 2007 WL 1238651, at *7 (D. Conn. Apr. 27, 2007) ("[S]ince the [defendant] did not brief the issue . . . , the [c]ourt will not grant [the] [d]efendant's motion to dismiss [the] [p]laintiffs' . . . claim at this time.").

10.)  The Second Circuit requires a "permissive standard" with respect to such requests, "consistent with [its] strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (citation and quotation marks omitted); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling [on a motion to dismiss], many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").  Nonetheless, such requests may be denied because of "undue delay, bad faith, dilatory motive, and futility." *Loreley*, 797 F.3d at 190.  Consistent with this guidance, the Court's Individual Rules indicate that Plaintiff's claims "may be dismissed with prejudice as the nonmovant already had a chance to research the movant's arguments and amend as needed." Individual Rules of Practice of the Honorable Kenneth M. Karas § II(A) (emphasis omitted). Thus, Plaintiff must seek leave to submit a second amended complaint by June 8, 2021. Defendants' opposition, if any, will be due by June 22, 2021.  The Court may dismiss Plaintiff's inadequately pleaded claims with prejudice without further notice in the event that he does not file such an application.

## III.  Conclusion

For the foregoing reasons, Defendants' Motion To Dismiss is granted in part and denied in part.  The Court will hold a conference on July 14, 2021, at 11 A.M.

The Clerk of the Court is respectfully requested to terminate the pending Motion, (Dkt. No. 26).

SO ORDERED.

DATED:     May 18, 2021
           White Plains, New York

_____
KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE