UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/3/23

ROMANO BERNARDI,

                              Plaintiff,

          - against -

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION
and DANIEL RUSHIA

                              Defendants.

**19 Civ. 11867 (PED)**

**DECISION AND ORDER**

**PAUL E. DAVISON, U.S.M.J.:**

On December 27, 2019, plaintiff Romano Bernardi commenced this action, pursuant to

Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §1983 ("Section 1983"), and

New York State Human Rights Law, N.Y. Exec. Law §§ 290-297 ("NYSHRL"), alleging claims

arising from his employment with defendant New York Department of Corrections and

Community Supervision ("DOCCS") and interactions with his supervisor, defendant Daniel

Rushia.  This case is before me for all purposes on the consent of the parties, pursuant to 28

U.S.C. §636 (c) (Dkt. 55).  Presently before this Court is the Defendants' motion for summary

judgment on Plaintiff's claims (Dkt. 75).  For the reasons set forth below, Defendants' motion is

**GRANTED IN PART** and **DENIED IN PART**.

### I. BACKGROUND

The following facts are gathered from the parties' statements pursuant to Local Civil Rule

56.1 of the United States District Courts for the Southern and Eastern Districts of New York,

from the pleadings and from affidavits, affirmations and exhibits submitted by the parties in

support of their contentions.  Any disputes of material fact are noted.[1]

A.    Backdrop

Plaintiff was born in Rome, Italy, but later immigrated to the United States.  Plaintiff

began working at DOCCS on October 4, 2002.  Plaintiff worked as an electrician, Grade 12 at

the Bedford Hills Correctional Facility.  Defendant Rushia has worked for DOCCS for

approximately 30 years.  For the period of time leading up to the end of Plaintiff's employment at

DOCCS, Defendant Rushia was Plaintiff's supervisor.  Plaintiff and Defendant Rushia were on

friendly terms until approximately April 2018.

Previously, in February 2014, Plaintiff filed a complaint with the New York State

Division of Human Rights ("NYSDHR").  Plaintiff alleged that DOCCS engaged in

discriminatory practices and further claimed that he was discriminated and retaliated against by

DOCCS employees and supervisors.  Plaintiff and DOCCS entered into a settlement agreement

on February 9, 2015.  (Dkt. 76-6 at 4.)[2]  The settlement agreement released DOCCS from any

claims arising out of Plaintiff's employment, "including but not limited to employment

discrimination claims", prior to February 9, 2015.  (Id. at 3.)

B.    Environment at DOCCS

In connection with this lawsuit, Defendants deposed Plaintiff.  In his deposition, Plaintiff

answered in the affirmative when asked if there was "a lot of back and forth" among the

maintenance employees at DOCCS.  (Dkt. 76-1 at 119.)  Plaintiff further stated that if someone

_____

[1] Certain factual allegations in the parties' 56.1 statements, whether disputed or undisputed, have been omitted from the factual recitation because they are not germane to the issues presently before the Court.

[2] Unless otherwise noted, page references refer to the ECF stamp at the top of the page.

2

took offense to those jokes, they should not be working in DOCCS.  (Id. at 126.)  Plaintiff

testified that he did not always write his coworkers up for these comments and jokes because he

was "in the game[.]"  (Id. at 127.)  Plaintiff testified that he referred to one of his colleagues as a

dummy, but in a joking manner, and that he called another co-worker, Anthony Mangione,

"Mangina".  (Id. at 122, 124-25.)

In connection with this lawsuit, Plaintiff also had the opportunity to depose Defendant

Rushia.  With respect to the environment at DOCCS, Defendant Rushia testified that there would

not be a direct attack involving references to people's nationality or race, but there might be

some off-color remarks.  (Dkt. 76-2 at 57.)  Defendant Rusia testified that one such example

concerned an employee from Trinidad.  (Id. at 58.)  Defendant Rushia testified that if the

employee was working on a fence, "people would joke that he didn't even have [that] technology

[in Trinidad]."  (Id.)

C.     Allocation of Overtime

At his deposition, Defendant Rushia also testified to the procedure for assigning

overtime.  Specifically, he testified that the procedure began with him posting a list outside his

office to see if individuals were interested in staying overtime.  (Dkt. 76-2 at 21.)  If individuals

signed up for that project, then he would call the Department Superintendent of Administration

("DSA") and confirm that those individuals could stay overtime.  (Id.)  Defendant Rushia further

testified that a lot of times he would receive requests for overtime verbally and that he did not

make a record of those requests.  (Id. at 22-23.)  If a person with a particular specialty was

needed on a project that required overtime, then overtime would be approved for an individual

with that specialty.  (Id. at 25.)  If that individual needed assistance, then an employee with a

3

lower grade would be assigned to assist before an employee with a higher grade. (Id. at 25-26.) The parties dispute the amount of overtime that Plaintiff worked. (Dkt. 81 at 29-31.) The parties also dispute the amount of overtime that foreign-born employees worked and the amount of overtime that American-born employees worked. (Id. at 31-43.)

D.     Events Leading Up to Plaintiff's Termination

On October 4, 2017, Plaintiff filed a complaint against his colleague Anthony Mangione to DSA Briget Wojnar. (Dkt. 76-9 at 2.) Plaintiff alleged that Mr. Mangione approached him with unacceptable abusive language and racist comments. (Id.) Plaintiff identified two such instances. First, Plaintiff described how on September 28th, he saw Mr. Mangione sleeping in his chair and had his feet on Plaintiff's chair. (Id.) Plaintiff pushed the chair that belonged to him with his feet. (Id.) He asked his supervisor to address Mr. Mangione's unacceptable behavior. (Id.) Plaintiff then described an incident that occurred on October 4th. (Id.) Plaintiff alleged that while he was having a discussion with his supervisor, Mr. Mangione entered into the office and started screaming "fuck you Italian ....and more[.]" (Id.)

In connection with these events, Defendant Rushia also filed documentation with DSA Wojnar. On October 5, 2017, Defendant Rushia stated that on October 2nd, he saw Plaintiff start yelling at Mr. Mangione and kick the chair that Mr. Mangione had his feet on. (Dkt. 76-11 at 2.) He also stated that Plaintiff called Mr. Mangione "many different things, like a drunk, etc." (Id.) Defendant Rushia then indicated that Plaintiff stormed into his office and "started giving me grief about [Mr. Mangione.]" (Id.) Defendant Rushia told Plaintiff that he would speak with Mr. Mangione about not antagonizing Plaintiff and that the two would only speak to each other about work. (Id.) Defendant Rushia then spoke to Mr. Mangione about the situation and asked him not

4

to antagonize Plaintiff further.  (Id.)  Defendant Rushia had previously filed a document on October 4th that recounted the events of the October 4th incident from his perspective.  (Dkt. 76-10 at 2.)  Defendant Rushia indicated that while they were in his office, Mr. Mangione told Plaintiff not to talk to him.  (Id.)  Defendant Rushia stated that both men raised their voices at each other, and that Mr. Mangione then left.  (Id.)  Defendant Rushia stated that Plaintiff stayed in his office to give him "a hard time about what I'm going to do about Mangione, telling me I'm not a boss and threatening my job with IG."  (Id.)  Defendant Rushia also noted that Mr. Mangione had been moved to work out of a different office.  (Id.)

In connection with the events on October 4, 2017, Plaintiff received a Memorandum regarding a Cease and Desist/Conduct within the Workplace dated October 25, 2017.  (Dkt. 76-13 at 2.)  The Memorandum indicated that a complaint had been lodged against Plaintiff regarding Plaintiff's inappropriate/unprofessional communication.  (Id.)  Also in connection with the events of October 4th, Plaintiff submitted a Diversity Management Complaint Form on November 3, 2017.  (Dkt. 76-14 at 2.)  He indicated that he was discriminated against due to his race and national origin.  (Id. at 3.)  In the complaint, he accused Mr. Mangione of not working and stated that his supervisor had lost control.  (Id. at 5-9.)  He further indicated that a "few times he [presumably Mr. Mangione] told me to go back to Italy[.]"  (Id. at 8.)

On April 9, 2018, Plaintiff addressed a Memorandum to Defendant Rushia regarding a "Racial Incident Discrimination".  (Dkt. 76-15 at 2.)  In the Memorandum, Plaintiff indicated that he approached Mr. Mangione that day.  (Id.)  He stated that Mr. Mangione was visibly angry and smelled of alcohol.  (Id.)  He noted that Mr. Mangione had bumped into him and called him a "piece of shitt [sic]".  (Id.)  On April 10, 2018, Defendant Rushia sent a document to Deputy

Superintendent LaManna about the events of April 9th. (Dkt. 76-16 at 2.) He indicated that

Plaintiff had told him about the incident with Mr. Mangione, and that Plaintiff said he was going

to write Mr. Mangione up for it. (Id.) Defendant Rushia further indicated that later that morning,

he was told Mr. Mangione had written up Plaintiff that morning, before Plaintiff submitted his

complaint. (Id.)

In connection with the events of April 9th, Plaintiff received a Memorandum regarding a

Cease and Desist Order dated April 11, 2018. (Dkt. 76-17 at 2.) The Memorandum advised

Plaintiff that "due to continued reports of failure to display professional conduct in the workplace

and complaints of harassment and bullying you are hereby directed to refrain from having any

contact with fellow employee Anthony Mangione, unless directly related to your job and directed

by your supervisor, [Defendant] Rushia." (Id.)

On April 12, 2018, Defendant Rushia addressed a document to Plaintiff regarding formal

counseling. (Dkt. 76-22 at 2.) In the document, Defendant Rushia noted that the previous day he

had Plaintiff slated to work in the evening on the ceiling outside of Steward Weir's office. (Id.)

However, after discussing it with Steward Weir, Defendant Rushia decided that the work would

not be done that night. (Id.) When Defendant Rushia told Plaintiff, he "became instantly angry,

and said to [Defendant Rushia] with Steward Weir . . . present, 'Danny who is the fucking boss

you or her?'" (Id.) During the counseling session, Defendant Rushia noted that Plaintiff did not

appear to be receptive to his comments and that he "continually attempted to direct the

conversation off topic by repeatedly saying that [Defendant Rushia] only give[s] overtime to

people that [he] like[s] and that [he] send[s] all of the immigrant's [sic] home." (Id.)

On April 12, 2018, Defendant Rushia composed a document to DSS Daye regarding an

6

altercation he had with Plaintiff prior to their formal counseling session.  (Dkt. 76-18 at 2.)  He

noted that he and DSA Wojnar were scheduled to conduct formal counseling with Plaintiff

concerning an incident that happened on April 11th outside of Steward Weir's office.  (Id.)

Defendant Rushia stated that as he was setting up the chairs, Plaintiff came over to him and

"asked why I was doing this and then went on to tell me that I should think about my retirement

and my family."  (Id.)  Defendant Rushia indicated that he became very upset and that at that

time, DSA Wojnar came over to get the meeting started.  (Id.)  On April 12, 2018, DSA Wojnar

also submitted a document regarding Defendant Rushia's incident with Plaintiff.  (Dkt. 76-21 at

2.)  In the document, she indicates that she heard Plaintiff say "something to the effect of 'You

better watch about your retirement and your family.'"  (Id.)

On April 12, 2018, Plaintiff received a Cease and Desist Notification from Michael Daye,

Superintendent for Security.  (Dkt. 76-23 at 4.)  The notification informed Plaintiff that he was to

cease and desist any contact with DSA Wojnar and Defendant Rushia.  (Id.)  On the same day,

Plaintiff also received a Memorandum that notified him that he was being immediately

suspended, without pay.  (Dkt. 76-23 at 2.)  The Memorandum further indicated that a "Notice

of Discipline stating the reasons for discipline and the proposed penalty will be mailed to your

latest address of record, which is 10 Central Way Purdys 10578."[3]  (Id.)

On April 13, 2018, a Notice of Discipline ("NOD") was sent to Plaintiff.  The Notice of

Discipline concerned the statements Plaintiff made to Defendant Rushia on April 12, 2018.  (Dkt.

76-27 at 3.)  The NOD indicated that it would implement the penalty of dismissal from service

and loss of any accrued annual leave.  (Id.)  The NOD further indicated that any further

---

[3] The address is hand-written.  (Dkt. 76-23 at 2.)

communications would be sent to Plaintiff's latest address at 10 Central Way, Purdys, NY 10578. (Id.) Another NOD was addressed to Plaintiff on June 12, 2018. (Dkt. 76-29 at 2.) The NOD concerned the statements Plaintiff made on October 4, 2017 and November 2, 2017, whereby Plaintiff indicated that Mr. Mangione had told him "fuck you Italian" and to "go back to Italy". (Id. at 2-3.) The NOD concluded that these statements that Plaintiff alleged Mr. Mangione to have said were false or inaccurate. (Id.) The NOD indicated that it would implement the penalty of dismissal from service and loss of any accrued annual leave. (Id.) Plaintiff received another NOD dated July 26, 2018. (Dkt. 76-31 at 3.) This NOD concerned how from approximately March 12, 2018 to April 12, 2018, Plaintiff repeatedly referred to Mr. Mangione as "mangina." (Id.) The NOD indicated that it would implement the penalty of dismissal from service and loss of any accrued annual leave. (Id.) The NOD further indicated that any further communications would be sent to Plaintiff's latest address at 10 Central Way, Purdys, NY 10578. (Id.)

On May 22, 2018, Plaintiff provided a notice of claim to Defendant DOCCS that alleged that Plaintiff was discriminated against due to his national origin and retaliated against for his vocal opposition to the unfair distribution of overtime between foreign-born employees and American-born employees. (Dkt. 35-1 at 15-17.) On August 2, 2018, Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge of discrimination, alleging discrimination based on national origin and retaliation. (Dkt. 76-32 at 4.)

On November 13, 2018, Plaintiff received a letter from DOCCS's Director of Labor Relations. (Dkt. 76-33 at 2.) The letter was addressed to Plaintiff at 2 Bridge Lane, Brewster, NY 10509. (Id.) The letter concerned the June 12, 2018 NOD and indicated that the Director of Labor Relations had not received anything from Plaintiff that indicated that he contested the

8

charges. (Id.)  The letter further indicated that it must receive any documentation by November 21, 2018.  (Id.)

On November 30, 2018, the Director of Labor Relations sent a memorandum concerning Plaintiff's termination to the Director of Personnel.  (Dkt. 76-34 at 2.)  The memorandum indicated Plaintiff failed to timely appeal his June 12, 2018 NOD and he was therefore terminated.  (Id.)

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In determining whether the moving party has met its burden of proving that no factual issues exist, the court must resolve all ambiguities and draw all factual inferences in favor of the party opposing the motion.  See Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010). However, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence."  Porter v. Quarantillo, 722 F.3d 94, 97 (2d Cir. 2013).  Further, "assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005).

"When the opposing party bears the burden of proof at trial, summary judgment should be granted if the moving party 'can point to an absence of evidence to support an essential element of the nonmoving party's claim.'"  Michael Bandler, MB & Co. v. BPCM NYC, Ltd., 631 F.

9

App'x 71, 71 (2d Cir. 2016) (summary order) (quoting Goenaga v. March of Dimes Birth Defects

Found., 51 F.3d 14, 18 (2d Cir. 1995)).  Thus, "[a] defendant moving for summary judgment

must prevail if the plaintiff fails to come forward with enough evidence to create a genuine

factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100

F.3d 253, 258 (2d Cir. 1996).  However, "[t]he mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary

judgment." Scott v. Harris, 550 U.S. 372, 380 (2007).  The question is whether, in light of the

evidence, a rational jury could find in favor of the nonmoving party.  See Beyer v. County of

Nassau, 524 F.3d 160, 163 (2d Cir. 2008).  Therefore, summary judgment must be denied if the

court finds "there are any genuine factual issues that properly can be resolved only by a finder of

fact because they may reasonably be resolved in favor of either party." See Anderson v. Liberty

Lobby, 477 U.S. 242, 250 (1986).

B.  Title VII Discrimination

Under Title VII, it is "an unlawful employment practice for an employer . . . to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e–2(a)(1).  Title VII discrimination claims are governed by the familiar

burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

See Tolbert v. Smith, 790 F.3d 427, 434 (2d Cir. 2015).  Under the McDonnell framework, in

order to establish a *prima facie* case of discrimination, a plaintiff "must show: (1) he belonged to

a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse

employment action; and (4) that the adverse employment action occurred under circumstances

giving rise to an inference of discriminatory intent." Holcomb v. Iona College, 521 F.3d 130,

138 (2d Cir. 2008).  If a plaintiff makes a *prima facie* showing, "[t]he burden then shifts to the

employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment."

Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 83 (2d Cir. 2015) (quoting McDonnell,

411 U.S. at 802).  "If the employer articulates such a reason for its actions, the burden shifts back

to the plaintiff to prove that the employer's reason 'was in fact pretext' for discrimination."  Id.

(quoting McDonnell, 411 U.S. at 804).

   Here, Defendants do not dispute that Plaintiff has established the first two prongs of his

*prima facie* discrimination case.  In his Second Amended Complaint, Plaintiff indicates that he,

as well as other foreign-born employees, were discriminated against because they did not receive

the same amount of overtime as American-born employees.  Defendants argue that in terms of

overtime hours actually allocated, Plaintiff had higher overtime earnings than almost all of the

American-born maintenance workers.[4]  Defendants also argue that Plaintiff cannot establish that

there is discriminatory intent behind the allocation of overtime.  Plaintiff does not directly attack

Defendants' arguments, but instead focuses on the statistical difference between foreign-born

employees and American-born employees.  Plaintiff further argues that the statistics are incorrect

because they do not include verbal allocations of overtime.

   These issues indeed implicate the third and fourth elements of Plaintiff's Title VII

discrimination claim.  Because Plaintiff is an individual private plaintiff, he "must prove that [he

---

[4] Defendants also seem to argue that Plaintiff is asserting a Title VII discrimination claim where the adverse event was his termination. (Dkt. 78 at 20-21.)  However, any such claims were dismissed in an earlier Order and Opinion (Dkt. 32 at 19-23) and Plaintiff did not reassert them in his Second Amended Complaint (Dkts. 33-35).  Accordingly, this Court will not address that argument.

was], individually, the victim[] of intentional discrimination." Simmons-Grant v. Quinn

Emanuel Urquhart & Sullivan, LLP, 915 F. Supp. 2d 498, 505 (S.D.N.Y. 2013). Accordingly,

"[s]tatistics alone do not suffice to establish an individual disparate treatment claim for a very

good reason: the particular plaintiff must establish he was the victim of . . . discrimination."

Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir. 2012). Here, Plaintiff does not claim that he, as

an individual, received less overtime because he was foreign-born. Accordingly, he has not

shown that the alleged discriminatory allocation of overtime was an adverse employment action

for him. Plaintiff also does not employ typical methods of proving discriminatory intent, such as

identifying American-born comparators who received overtime at a higher rate than he did, or

identifying specific instances where he requested overtime and did not receive it. See, e.g., Ruiz

v. County of Rockland, 609 F.3d 486, 493 (2d Cir. 2010) (describing the use of comparators to

show discriminatory intent); Simmons-Grant, 915 F. Supp. 2d at 505 (observing that plaintiff

failed to assert instances where she did not receive an assignment which would have given rise to

a discriminatory intent). Instead, Plaintiff relies solely on statistics for foreign-born employees

overall in comparison to American-born employees. This is insufficient to establish that Plaintiff

*as an individual* suffered from a discriminatory allocation of overtime. See Reynolds, 685 F.3d

at 202.

Further, Plaintiff's contention that the statistics are invalid does not advance his case. In

order to establish an individual disparate treatment claim, statistics could support Plaintiff's

claim but he would also have to proffer evidence that would demonstrate he was actually a

victim of the disparate treatment. See Reynolds, 685 F.3d at 202-03 & n.11 (noting that statistics

may support an individual disparate treatment claim but cannot do so alone). As noted above,

Plaintiff points to no additional evidence that would support his individual disparate treatment claim. Plaintiff "has thus failed to proffer evidence from which a fact finder could properly determine that []he suffered an adverse employment action attributable to . . . disparate treatment, and Defendant[s] [are] entitled as a matter of law to judgment dismissing [his] Title VII . . . discrimination claim." Simmons-Grant, 915 F. Supp. 2d at 505.

C. Hostile Work Environment

Plaintiff claims that while working for Defendants, he was subject to a hostile work environment pursuant to Title VII, Section 1983, and NYSHRL. "The standard for showing a hostile work environment under Title VII, Section 1981, Section 1983, and the New York State Human Rights Law is essentially the same." Smith v. Town of Hempstead Dep't Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011) (citing Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006); Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 225 (2d Cir. 2004)).[5] To establish a hostile work environment, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Littlejohn v. City of New York, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

On summary judgment, the Second Circuit has instructed courts to "examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity;

---

[5] Plaintiff argues that his claims under New York City Human Rights Law must be evaluated separately. Indeed, that would be true, if Plaintiff had alleged any claims in his Second Amended Complaint under New York City Human Rights Law. See Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 278 (2d Cir. 2009). However, Plaintiff has only asserted claims under Title VII, Section 1983, and NYSHRL. (Dkt. 35 at 18-20.)

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." Rivera v. Rochester Genesee Regional Transp. Authority, 743 F.3d 11, 20 (2d Cir. 2014) (alterations omitted).  The "test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." Id.  Further, the "incidents complained of must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014) (internal quotation marks omitted).  A single incident may also establish a hostile work environment, but that incident would need to be "extraordinarily severe." Desardouin v. City of Rochester, 708 F.3d 102, 105 (2d Cir. 2013).  "Of course, it is axiomatic that mistreatment at work, whether through subjection to a hostile environment or through other means, is actionable under Title VII only when it occurs because of an employee's *protected characteristic*, such as race or national origin." Rivera, 743 F.3d at 20 (alterations and internal quotation marks omitted).

Here, Defendants argue that Plaintiff has failed to establish that they created a hostile working environment.  Plaintiff responds by summarily asserting that a jury may "find that the discriminatory remarks were sufficient to create a severe hostile working environment[.]" (Dkt. 82 at 11.)  Plaintiff, however, does not identify the discriminatory remarks to which he is referring.[6]

---

[6] Plaintiff summarily asserts that "a jury will hear far more facts supporting the pervasiveness and severity of the hostility in the workplace." (Dkt. 82 at 11.)  Regardless of what some future hypothetical jury might hear, however, Plaintiff has not proffered such facts in his current opposition to summary judgment and such conclusory assertions are insufficient to fend off summary judgment.  See Major League Baseball Properties, Inc. v. Salvino, Inc., 542

At his deposition, Plaintiff testified that after the settlement in February 2015, only Anthony Mangione uttered ethnic slurs against him. (Dkt. 76-1 at 113.)[7] Plaintiff identified two such instances in the complaint he filed with DSA Wojnar on October 4th. (Dkt. 76-9 at 2.) These include an incident that occurred on September 28th wherein Plaintiff claims that Mr. Mangione lodged abusive language and racist comments at Plaintiff. (Dkt. 76-9 at 2.) Plaintiff also identifies another incident that occurred on October 4th wherein Plaintiff alleges that Mr. Mangione screamed "fuck you Italian" at Plaintiff, as well as some additional language. (Id.) In connection with the events of October 4th, Plaintiff submitted a Diversity Management Complaint Form on November 3, 2017. (Dkt. 76-14 at 2.) In the complaint, he indicates that a "few times" Mr. Mangione had told him to "go back to Italy[.]" (Dkt. 76-14 at 8.) Plaintiff does not specify when Mr. Mangione made these statements. Plaintiff identified another incident on April 9, 2018, in which Mr. Mangione bumped into him and called him a "piece of shitt [sic]". (Dkt. 76-15 at 2.) Beyond these incidents, Plaintiff does not identify any further instances after the February 2015 settlement where an individual at DOCCS uttered an ethnic slur against him.[8]

---

F.3d 290, 310 (2d Cir.2008).

[7] Plaintiff also points to much testimony about incidents involving Steve Grieving. (See Dkt. 76-1 at 107, 111-12, 115, 140, 147; see also id. at 344.) However, Plaintiff's testimony makes clear that the incidents with Mr. Grieving occurred before the settlement in February 2015, and that by the time of the settlement, Mr. Grieving had been transferred to another facility. (See id. at 115, 147.) Because the February 2015 settlement included a release of all claims relating to employment discrimination, Plaintiff cannot rely on pre-February 2015 incidents in his current complaint. See Difilippo v. Barclays Capital, Inc., 552 F. Supp. 2d 417, 426 (S.D.N.Y. 2008); see also Dkt. 76-6 at 3.

[8] In opposition to the Defendants' Rule 56.1 statement, Plaintiff directed the court to testimony indicating that Anthony Mangione, Steve Grieving, Jeffrey Flansburg, and Alfred Mann had uttered Italian slurs against him. (Dkt. 81 at 24.) In the initial testimony, Plaintiff indicated that "[n]obody" had uttered racial slurs against him. (Dkt. 76-1 at 140.) However, in

In examining the totality of the circumstances, I conclude that these incidents are not enough to establish a hostile working environment.  Plaintiff first fails to show that the discriminatory conduct was frequent.  Since his settlement in February 2015, Plaintiff only alleges three specific incidents and a few other times in which he was told to go back to Italy.  Given that this discriminatory conduct took place over the course of three years, this Court would be hard pressed to conclude that a reasonable jury could find that the discriminatory conduct was frequent, as opposed to episodic.  See Chukwuka v. City of New York, 513 F. App'x 34, 36 (2d Cir. 2013) (finding that three events over the course of a year did not support a finding of hostile work environment).  Although these alleged incidents may have been "offensive and inappropriate, they are sufficiently isolated and discrete that a trier of fact could not reasonably conclude that they pervaded the plaintiff's work environment."  Carter v. New York, 151 F. App'x 40, 41 (2d Cir. 2005).  Further, the incidents taken together are not severe, and no single incident alone is severe enough to support a finding of a hostile work environment.  This is particularly true in the context of the DOCCS environment, where Plaintiff himself testified that

---

his errata sheet, Plaintiff changed his answer to "Anthony Mangione, Steve Grieving, Jeffrey Flansburg, and Alfred Mann." (Id. at 344.) Pursuant to Rule 30(e), a deponent may make changes to a deposition transcript. When a deponent makes a change, both the original testimony and the change become part of the record. See Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 103 (2d Cir. 1997). "A district court should weigh the 'totality of the evidence' in considering whether the alteration to the prior testimony creates an issue that must be determined by a jury." Barnes v. Ross, 2014 WL 1329128, at *11 (S.D.N.Y. Apr. 3, 2014) (quoting Podell, 112 F.3d at 103). In considering the totality of the evidence, it seems that these statements were likely made prior to the February 2015 settlement, particularly given that Steven Grieving was not in the same facility as Plaintiff post-settlement, and Plaintiff testified that after the settlement only Mr. Mangione uttered racial slurs against him. Further, even if the court were to accept the errata sheet at face value, it would not be sufficient to defeat summary judgment because Plaintiff fails to allege the frequency or severity of such comments and whether they interfered with his job. See Daeisadeghi v. Equinox Great Neck, Inc., 794 F. App'x 61, 63-64 (2d Cir. 2019).

the environment included comments and jokes and that he participated in this environment.  See

Perry v. Slensby, 815 F. App'x 608, 611 (2d Cir. 2020) ("In this context, [defendant's] conduct

and comments were not so humiliating as to take them outside the run-of-the-mill, if unpleasant,

vulgarity present in this workplace."); see also Daeisadeghi, 794 F. App'x at 64 ("Title VII does

not set forth a general civility code for the American workplace, and simple teasing or offhand

comments will not amount to discriminatory changes in the terms and conditions of

employment[.]" (internal citations, quotation marks, and alterations omitted)).  Finally, Plaintiff

fails to identify any evidence that indicates that these incidents interfered with his employment.

See Willaims v. Geiger, 447 F. Supp. 3d 68, 85-86 (S.D.N.Y. 2020) (noting plaintiff's failure to

identify evidence that incidents interfered with work).  The Court therefore concludes that no

reasonable juror could find that a hostile work environment existed as to Plaintiff, and grants

Defendants summary judgment on Plaintiff's hostile work environment claims.

D.  Title VII Retaliation

     Title VII prohibits an employer from discriminating against an employee because the

employee "has opposed any practice made an unlawful employment practice by this subchapter,

or because he has made a charge, testified, assisted, or participating in any manner in any

investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a)).  As is the

case with Title VII discrimination claims, retaliation claims are analyzed under the McDonnell

framework.  See Summa v. Hofstra Univ., 708 F.3d 115, 125 (2d Cir. 2013).  "To establish a

*prima facie* case of retaliation, an employee must show that (1) []he was engaged in protected

activity; (2) the employer was aware of that activity; (3) the employee suffered a materially

adverse action; and (4) there was a causal connection between the protected activity and that

adverse action." Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012). "If the employee

establishes a prime facie case, the burden shifts to the employer to provide a non-retaliatory

rationale for the adverse action." Murphy v. City of Newburgh, 785 F. App'x 900, 901 (2d Cir.

2019). If the employer provides a non-retaliatory rationale for the adverse action, then the

employee may prevail by showing that the rationale is mere pretext. Id. An employee shows that

a reason is pretext, by demonstrating that the retaliation was a "but for" cause of the adverse

employment action. Id. at 901-02. "An employee demonstrates 'but for' causation by proving

that the adverse action would not have occurred in the absence of the retaliatory motive." Id. at

902 (internal quotation marks omitted).

Starting with the first element, Defendants identify the protected activity as Plaintiff's

filing of an EEOC complaint on August 2, 2018. (Dkt. 76-32 at 4.) However, Plaintiff puts forth

a timeline in which he indicates that he was retaliated against for complaining about the

discriminatory language that Mr. Mangione used against him. "The term 'protected activity'

refers to action taken to protest or oppose statutorily prohibited discrimination." Wright v.

Monroe Cmty. Hosp., 493 F. App'x 233, 236 (2d Cir. 2012). For a plaintiff's complaint or

request to constitute protected activity, he is required "to have had a good faith, reasonable belief

that he was opposing an employment practice made unlawful by Title VII." McMenemy v. City

of Rochester, 241 F.3d 279, 285 (2d Cir. 2001). Here, the record clearly shows that Plaintiff

complained about Mr. Mangione's unacceptable abusive language and racist comments to DSA

Wojnar on October 4, 2017. (Dkt. 76-9.) The record also shows that Plaintiff submitted a

Diversity Management Complaint Form on November 3, 2017. (Dkt. 76-14 at 2.) In that

complaint, Plaintiff indicated that he was discriminated against due to his race and national

origin, and specifically alleged that Mr. Mangione had told him to go back to Italy.  Finally, the record shows that Plaintiff submitted a memorandum to Defendant Rushia alleging a "Racial Incident Discrimination" on April 9, 2018. (Dkt. 76-15 at 2.)  These internal complaints amount to protected activity, as Plaintiff had a good faith, reasonable belief that he was opposing Mr. Mangione's engagement in discriminatory behavior in violation of Title VII.  See Bowen-Hooks v. City of New York, 13 F. Supp. 3d 179, 222 (E.D.N.Y. 2014) ("The complaint can be informal—an employee does not need to lodge a formal complaint of discrimination.").  In addition to these internal complaints, Plaintiff also provided Defendants with a notice of claim on May 22, 2018, and filed an EEOC charge on August 2, 2018.  As noted above, Defendants do not dispute that the EEOC charge is a protected activity.  (Dkt. 78 at 28.)  Accordingly, there are four instances in which Plaintiff engaged in protected activity by complaining about discrimination at DOCCS.  Further, because these complaints alert Defendants to potential violations of Title VII, Plaintiff satisfies the second element as well.  See Murphy, 785 F. App'x at 902 ("[F]or a plaintiff to satisfy element (2) of the prima facie case, the employer must have understood, or could reasonably have understood, that the plaintiff's complaint was directed at conduct prohibited by Title VII." (internal quotation marks and alteration omitted)).

With respect to the third element, Defendants concede that the adverse action is satisfied by Plaintiff's termination.  Plaintiff, however, asserts that he experienced adverse actions by way of the three NODs, in addition to his termination.  Indeed, "a reasonable jury could find that, at least, the notice of discipline was itself sufficiently adverse to give rise to an actionable retaliation claim."  White v. Department of Correctional Servs., 814 F. Supp. 2d 374, 388 (S.D.N.Y. 2011) (collecting cases).  Plaintiff therefore satisfies the element of adverse action

19

with his termination, as well as the three NODs.

For the final element, Defendants argue that there is no causal connection between the protected activity and the adverse event. "A causal connection in retaliation claims can be shown either (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Littlejohn, 785 F.3d at 319 (internal quotation marks omitted). When a claim relies merely on the temporal proximity between an employer's knowledge of the protected activity and the adverse event, "the temporal proximity must be very close." Preuss v. Komsar Labs., Inc., 970 F. Supp. 2d 171, 198 (S.D.N.Y. 2013) (citations omitted). "Generally, to show causation through temporal proximity alone, courts in this Circuit require no more than two months to have passed between a protected activity and an adverse action." Dodd v. City Univ. of New York, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020). Here, Plaintiff's complaints on October 4, 2017 and November 3, 2017 fall well outside of two months from any adverse event. Accordingly, without more, Plaintiff cannot show that the adverse events were the result of Plaintiff's complaints on October 4, 2017 and November 3, 2017. Plaintiff's final complaint of discrimination on April 9, 2018 presents a different situation as the first NOD was issued days later on April 13, 2018. The time between these two events is four days, which is indeed very close and is certainly close enough to establish a causal connection. See Farmer v. Shake Shack Enters., LLC, 473 F. Supp. 3d 309, 334 (S.D.N.Y. 2020). Further, Plaintiff's notice of claim was provided to Defendants on May 22, 2018, and three weeks later Defendants issued the June 12, 2018 NOD, which ultimately led to Plaintiff's

termination. This is also sufficiently close in temporal proximity to establish a causal connection. See Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013) ("The three-week period from [plaintiff's] complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity."). However, there is no protected activity that is sufficiently close in time to either the July 26, 2018 NOD or to Plaintiff's termination to establish a causal connection through temporal proximity. Plaintiff has also not presented any direct evidence showing animus to establish the causal connection between a protected activity and those two adverse events. Accordingly, Plaintiff satisfies the fourth element, but only with respect to the April 13, 2018 NOD and the June 12, 2018 NOD.

Defendants argue that there were legitimate non-retaliatory reasons for the NODs. The April 13, 2018 NOD concerned the statements Plaintiff made to Defendant Rushia on April 12, 2018, whereby Defendant Rushia interpreted Plaintiff's statements to be a threat. (Dkt. 76-27 at 3.) Plaintiff does not point to any evidence, or even argue, that such a reason is pretext for the issuance of the April 13, 2018 NOD. Accordingly, this Court is unable to conclude that a reasonable jury would find a pretext where Plaintiff has not proffered one, and Plaintiff's retaliation claim fails with respect to the April 13, 2018 NOD. The June 12, 2018 NOD presents a different circumstance. In their reply, Defendants argue that the June 12, 2018 NOD was issued in connection with witness statements regarding Plaintiff's behavior. The witness statements that Defendants refer to concern the events of April 11, 2018 and instances where Plaintiff called Mr. Mangione "Mangina." (Dkt. 76-28.) However, the June 12, 2018 NOD does not concern either of those incidents, but instead indicates that Plaintiff made false statements in his memorandum on October 4, 2017 and in his November 3, 2017 complaint. (Dkt. 76-29.)

Accordingly, the witness statements have no bearing on the June 12, 2018 NOD.  Further,

Plaintiff argues that the evidence of pretext is the fact that the NOD was never sent to his updated

address.  This is particularly peculiar because both the April 13, 2018 NOD and the July 26, 2018

NOD were addressed to the correct address.  This unexplained discrepancy, in addition to the

temporal proximity outlined above, is sufficient to defeat summary judgment.  See Zann Kwan,

737 F.3d at 847 ("[A] plaintiff may rely on evidence comprising her prima facie case, including

temporal proximity, together with other evidence such as inconsistent employer explanations, to

defeat summary judgment at that stage.").[9]  Accordingly, Plaintiff's Title VII retaliation claim

presents a triable issue of fact and therefore Defendants are not entitled to summary judgment on

this claim.[10]

---

[9] Defendants also argue that Plaintiff was aware of the June 12, 2018 NOD, because on November 26, 2018 Plaintiff's counsel indicated that there were three NODs.  Setting aside whether counsel was actually aware of the three NODs, this argument is of no moment because it does not demonstrate that Plaintiff in fact received the June 12, 2018 NOD, which is the adverse event at issue here.

[10] The Court attaches no significance to Plaintiff's insinuation that spoliation of evidence "may have" occurred.  (Dkt. 82 at 23.)  The Court notes that during a telephone conference on July 8, 2022, it instructed the parties to raise any discovery disputes by July 22, 2022.  In spite of that instruction, Plaintiff did not file an application to compel the video and related memos.  Accordingly, Plaintiff has waived this issue.

### III.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. In view of the undersigned's retirement later this month, the parties are directed to submit a joint status letter, requesting a case management conference, within five (5) business days of receipt of a notice of reassignment to a new judge.

The Clerk of the Court is respectfully directed to terminate the pending motion (Dkt. 75).


Dated:   May 3, 2023
        White Plains, New York

**SO ORDERED.**

_____
PAUL E. DAVISON, U.S.M.J.